**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **ASHRAF MAHMOUD AND** | § | |
| **VALERIE JACKSON,** | § | |
| | § | |
| **Plaintiffs,** | § | |
| | § | |
| **v.** | § | **Civil Case No:_____** |
| | § | |
| **DE MOSS OWNERS** | § | **JURY TRIAL DEMANDED** |
| **ASSOCIATION, INC.,** | § | |
| **CREATIVE MANAGEMENT** | § | |
| **CO., FRANK, ELMORE,** | § | |
| **LIEVENS, CHESNEY, &** | § | |
| **TURET, L.L.P., KRISTI A.** | § | |
| **SLAUGHTER, AND KHOSROW** | § | |
| **ABTAHI** | § | |
| | § | |
| **Defendants.** | § | |

# PLAINTIFFS' ORIGINAL COMPLAINT

## A. PARTIES

1.    Plaintiff, MAHMOUD ASHRAF, is an individual and resident of the State of Texas.

2.    Plaintiff, VALERIE JACKSON, is an individual and resident of the State of Texas.

3.    Defendant, DE MOSS OWNERS ASSOCIATION, INC., is a corporation organized under the laws of the State of Texas. Defendant has its

principal place of business in the State of Texas. Defendant may be served with process by serving its registered agent, CREATIVE MANAGEMENT COMPANY, at 8323 Southwest Freeway, Suite 330, Houston, TX 77074, in Harris County, Texas.

4.      Defendant, CREATIVE MANAGEMENT CO., is a corporation organized under the laws of the State of Texas. Defendant has its principal place of business in the State of Texas. Defendant may be served with process by serving its registered agent, Edward J. Kroger, at 3100 Weslayan, Suite 300, Houston, TX 77027, in Harris County, Texas.

5.      Defendant, FRANK, ELMORE, LIEVENS, CHESNEY, & TURET, L.L.P., is a limited liability partnership organized under the laws of the State of Texas. Defendant has its principal place of business in the State of Texas. Defendant may be served with process by serving its registered agent, Jerry L. Elmore, at 9225 Katy Freeway, Suite 250, Houston, TX 77024-1564, in Harris County, Texas.

6.      Defendant, KRISTI A. SLAUGHTER, an individual and citizen of the State of Texas, may be served with process at 9225 Katy Freeway, Suite 250, Houston, TX 77024-1564, in Harris County, Texas.

7.     Defendant, KHOSROW ABTAHI, an individual and citizen of the State of Texas, may be served with process at 3075 Walnutbend, No. 15, Houston, TX 77042, in Harris County, Texas.

## B. JURISDICTION

8.     Plaintiffs seek statutory and actual damages, including recovery of real property, for violations of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. §1692 *et seq*.  Federal question jurisdiction exists under 28 U.S.C. §1331.

9.     Plaintiffs also seek statutory and actual damages, including recovery of real property, under state law arising out of the same nucleus of operative facts as plaintiffs' FDCPA claims, thus forming part of the same case or controversy.  Supplemental jurisdiction exists under 28 U.S.C. §1367.

## C. VENUE

10.     Venue is proper in this district under 28 U.S.C. §1391(b)(1) because the individual defendants reside in this district. Venue is also proper in this district under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to this claim occurred in this district. Finally, venue is also proper in this district under 28 U.S.C. §1391(b)(2) because a substantial part of the property at issue is situated in this district.

## D. CONDITIONS PRECEDENT

11.    All conditions precedent have been performed or have occurred.

## E. FACTS

### Background and Course of Dealing

12.    In 1997, plaintiffs purchased a condominium located at 6606 De Moss Drive, Unit No. 806, Houston, Texas  77074, in Harris County, Texas (the Property).  The Property's location is unique and essential for plaintiffs' personal use and to provide access to the medical center, as a place to rest after plaintiffs' son, Adam, takes medical treatments for hemophilia.  Plaintiffs use the Property exclusively for personal, family and household purposes.

13.    The Property is part of a condominium project subject to the Condominium Declaration for De Moss Condominiums, established in 1981 and recorded in Volume 120, Page 83, *et seq*. of the Condominium Records, Harris County, Texas (the Declaration).  The Declaration provides for management of the entire condominium project by a governing entity named De Moss Owners Association, Inc." (De Moss).  De Moss is further governed under authority of certain "By-Laws" filed for record at County Clerk file No. 20070072987, in Harris County, Texas (the By-Laws).

14.   The Declaration provides that owners of individual condominium units are "Unit Owners" and that all Unit Owners are members of De Moss.   The Declaration at paragraph 7.7 requires that material amendments to the Declaration and/or the By-Laws be approved in writing by 100% of the Unit Owners.   The Declaration at paragraph 8.1 permits amendment of the Declaration by 90% of the Unit Owners, and requires that any amendment be duly recorded in the real property records.

15.   The Declaration defines only two types of assessment: Common Assessment and Special Assessment.   Common Assessment means the charge against each Unit Owner and his Unit, representing his portion of the total cost to the association for maintaining, improving, repairing, replacing, managing and operating the entire property.   Special Assessment means a levy against Unit Owners, in any particular year, for certain costs or expenditures incurred by De Moss not included in the Common Assessment. Special Assessments may be levied only for limited categories of expenditure and under certain conditions.   Special Assessments must be levied in accord to each Unit Owner's interest in the Common Elements and cannot be levied against a single Unit Owner and Unit without notice and an opportunity to be heard.   Both Common and Special Assessments are limited

to the recovery of costs, and therefore fines and/or penalties may not be charged against a Unit Owner by Common or Special Assessment.

16.     According to the Declaration, De Moss is obligated to make an annual determination of an "Assessment For Common Expenses" imposed against each Unit Owner, due monthly in advance on or before the first day of each month.  If an owner fails to pay his monthly installment by the 15th day of the month, the Declaration authorizes and requires imposition of a late charge of $5.00.  No instrument has been recorded in the real property records to provide for a change or increase to the amount of the late charge above $5.00.

17.     The Declaration provides that sums assessed but unpaid by a Unit Owner for its share of Common Expenses constitutes a lien against the Unit Owner's condominium unit ("Assessment Lien").  Other fees, fines, or penalties, that do not constitute a permitted cost or expenditure incurred by De Moss, cannot constitute a lien against the Unit Owner's condominium unit.

18.     The Declaration also provides that upon written request of any Unit Owner, De Moss must issue a written statement setting forth the amounts and dates of assessments and credits attributable to the Unit Owner's condominium unit.

19.    Pursuant to its authority under the Declaration and By-Laws, De Moss hired defendant Creative Management Company (Creative) as its agent to carry out condominium management services, for which De Moss is responsible, in part described in the foregoing paragraphs.  As Unit Owners, plaintiffs sought and acquired the management services provided by Creative and for which De Moss is responsible.

**Unauthorized Late Fees and Unauthorized Lien**

20.    In 2006, De Moss filed for record at County Clerk file No. Z381588, in Harris County, Texas a "Resolution Regarding Application of Funds" (the "Resolution").  Thereunder, De Moss purportedly resolved that all payments received on behalf of the Association would be applied as follows:

> Funds will first pay late fees, violation fines, attorney fees, damages/repair costs, and/or any other costs, with the exception of maintenance fees, that may be due on an account at the time payment is received.  The remaining balance of funds will then be applied to any maintenance assessment that is currently due on an account.

The Resolution terms do not appear in the Declaration or By-Laws, nor does authority to materially alter the terms of the Assessment Lien.  In fact, the Resolution constitutes an accounting gimmick designed to strip equity from Unit Owner's property by conversion of unsecured fees and charges to a fully secured assessment lien.

21.    Maintenance assessments constitute a lien against the Unit Holder's property. "[L]ate fees, violation fines, attorney fees, damages/repair costs, and/or any other costs, [that are not] maintenance fees" cannot constitute a lien against the Unit Holder's property (the Non-Lien Fees).[1] The Resolution alters the terms upon which the assessment lien is created and enforced against a Unit Holder's property. Because the Resolution prevents Unit Holders from paying their maintenance assessments without first paying Non-Lien Fees, the Resolution effectively converts unpaid or outstanding Non-Lien Fees into unpaid or outstanding maintenance assessments whenever a Unit Holder makes a monthly maintenance assessment payment.

22.    From time to time, plaintiffs were late in making their monthly assessment payments. In those instances, De Moss and/or Creative charged plaintiffs a late charge of $25.00, though the Declaration limits late charge assessments to $5.00. By their imposition of the inflated $25.00 late fee and the application of payments pursuant to the improperly imposed Resolution, De Moss and/or Creative generated a growing account balance in arrears against plaintiffs, consisting in part of Non-Lien Fees improperly converted

---

[1] It is at least ambiguous whether late fees can constitute a lien against the Unit Owner's condominium unit.

to assessment lien against plaintiffs' Property by accounting gimmick (the "Arrearage").

23.     Since 2006, De Moss and/or Creative routinely accepted monthly assessment payments from plaintiffs despite plaintiffs' growing Arrearage balance.  De Moss and/or Creative never notified plaintiffs that De Moss and/or Creative would one day refuse to accept plaintiffs' monthly assessment payments without full payment of the Arrearage.  That day arrived in October 2012.

**<u>Demand for Money and Foreclosure Notices</u>**

24.     By letter dated October 8, 2012, Defendant Kristi Slaughter (Slaughter) sent to plaintiffs a notice of default and intent to foreclose (the "October Letter"), which default, according to Slaughter's subject line, was:

> [I]n the total amount of $2,171.80 (constituting assessments, late fees, attorney fees and costs).

25.     According to her October Letter, Slaughter is an attorney at defendant law firm Frank, Elmore, Lievens, Chesney & Turet, L.L.P. (Turet), and represented defendant "De Moss Owners Association" (De Moss) in a claim against plaintiffs.  According to their internet website, Turet collects debts for community associations.

26.    Slaughter is an employee, partner or agent of Turet.  Turet is liable for Slaughter's bad acts within the scope of her employment, partnership or agency of Turet.

27.    Slaughter and Turet are agents for both De Moss and Creative in their demand letters and other correspondence and communications sent to plaintiffs by Slaughter.  De Moss and Creative are each liable for their agents' bad acts within the scope of their agency.

28.    By her October Letter, Slaughter demanded that plaintiffs make full payment or face 1) a forced sale of their property and 2) liability "for any and all additional attorneys (sic) fees incurred in connection with [the forced sale]."  Contrary to the default amount stated in the subject line of the October Letter, $2,171.80, Slaughter demanded in the last paragraph payment of $2,796.80 without explanation for the difference.

29.    Admittedly, on October 8, 2012, plaintiffs had not yet paid monthly maintenance payments, assessed by De Moss at $250.00 per month, for August, September or October 2012, a total of $750 (plus late fees for August and September).  Because Slaughter's demand was the first time De Moss communicated with plaintiffs demanding payment in full for the Arrearage, a demand on penalty of foreclosure for more than 3 times the

10

$750 plaintiffs believed they owed, the October Letter came as a shock and complete surprise to plaintiffs.

30.    Plaintiffs were also confused as to how to cure the purported default.  If the subject line were correct, it should have been possible to cure by payment of $2,171.80.  Nevertheless, the letter demanded that $2,796.80 be paid directly to Turet by December 3, 2012.  Slaughter's letter offered no explanation as to why $2,796.80 should be required to cure a default of $2,171.80.

31.    Importantly, Slaughter's October letter presented an offer whereby plaintiffs could request a "payment plan" to resolve the purported default and avoid foreclosure (the "Payment Plan"):

> In order to resolve these matters, the Association may be willing to enter into a payment plant.  You must submit a written request for a payment plan to our offices.  Upon receipt, your written request shall be submitted to the Board for its review and decision.  Please note, the association charges a fee of $200.00 for payment plans, and such amount would be included in the amounts to be paid under the terms of any such payment plan.  In addition, the association would require the payment of the regularly accruing monthly assessments prior to delinquency.  If a payment plan is approved, the same will be reduced to a written agreement that you must sign and return to our law firm at the letterhead address with the initial payment so both are received on or before Monday, December 3, 2012.

Slaughter's letter gives no indication whether plaintiffs or De Moss were expected to originate the Payment Plan and gives no standards for terms that might be acceptable to De Moss.

32.     Also absent from the October Letter were the disclosures required by 15 U.S.C. §§1692e(11) and 1692g.

33.     Shocked that lawyers were threatening to foreclose, and confused that lawyers were demanding immediate payment of an Arrearage of such magnitude without prior warning, plaintiffs could not determine how to cure the default.  Placing hope in Slaughter's Letter, plaintiffs complied with October Letter by tendering a written request for a Payment Plan in a letter dated November 17, 2012.  Therein, plaintiffs disputed a portion of the amount demanded by Slaughter and requested a breakdown of the charges. Along with their written request, plaintiffs tendered three checks of $250.00 each, constituting payment for the undisputed portion of the demand - the August, September and October assessments - a down payment of $750.00 toward the payment plan.

34.     Just three days later, by letter dated November 20, 2012 (the "November Letter"), Slaughter acknowledged receipt of plaintiffs' letter. Therein, Slaughter coldly announced her firm had posted the Property for

foreclosure sale on December 4, 2012.[2]   Additionally, Slaughter's demand had grown to $2,821.80, "which amount includes November 2012 late fees of $25.00."   While charging the November late fee, Slaughter simultaneously returned plaintiffs' three $250.00 checks, "[p]er the Association's instructions," along with a "verification/payment history of the account prepared by Creative Management Company," showing the "balance due and owing the Association was $2,796.80" (the "Payment History").

35.   Incredibly, Slaughter's November letter completely ignored plaintiffs' written request for a Payment Plan.  Slaughter never deigned to mention whether plaintiffs' written request was presented to and/or denied by De Moss, and/or why the request had been denied or ignored by De Moss.

36.   Testament to its illusory purpose and calculated to misdirect and lull plaintiffs to inaction in preventing foreclosure, the November Letter contained *another* invitation to make a written request for a Payment Plan, an invitation identical to that contained in the October Letter.  Bullied by Slaughter's "all or nothing" demands, frustrated and embarrassed by their

---

[2] In the November Letter, Slaughter makes reference to another letter dated November 12, 2012, presumably giving the statutory notice of sale.  However, plaintiffs cannot find any record of having received the letter dated November 12, 2012.

inability to understand the course of events, plaintiffs found themselves physically, emotionally and financially paralyzed in failing to elicit <u>any</u> response to their written request for a Payment Plan.

37.    Once again, conspicuously absent from the November Letter were the disclosures required by 15 U.S.C. §§1692e(11) and 1692g.

38.    According to the Payment History, De Moss began charging plaintiffs a late payment penalty of $25.00 in 2008, though the Declaration permits only a $5.00 late charge.  De Moss charged plaintiffs the $25.00 late penalty 19 times, totaling $475.00 by the time Slaughter sent her November Letter.  Though plaintiffs tendered $250.00 payments again in November and December 2012, and in January 2013, Slaughter purports to have returned the checks while De Moss continued charging $25.00 late payment penalties each month.

39.    Also clear from the November Letter and the Payment History, upon threat of foreclosure, Slaughter demanded the October 15th late penalty in her October Letter, before the late penalty was even due.

40.    The Payment History also shows that De Moss had created and for years carried a growing Arrearage balance attributable to plaintiffs' account while routinely accepting plaintiffs' monthly payments.  De Moss

never notified plaintiffs that their monthly payments would eventually be refused except on payment in full of the growing Arrearage.

41.     In addition to inflated late charges, and late charges for months where defendants refused to accept monthly payments, the Payment History also lists charges against plaintiffs' account that do not constitute a properly levied Common Assessment or Special Assessment: $346.80 for "Plumbing Repair," $575.00 for "Royal Investment Svc," $50.00 for "Violation Assessment," and $100.00 for "Violation Assessment."   By inclusion of these amounts in the demand, upon threat of foreclosure, De Moss and/or Creative overstated the amount of the assessment lien and put the cure of any properly calculated default out of plaintiffs' reach.

42.     Despite Slaughter's October and November Letters, no foreclosure sale occurred on December 4, 2012.  On information and belief, Slaughter never intended to execute her threat of foreclosure on that date, nevertheless charging plaintiffs for attorney fees and other costs to post the December 4, 2012 foreclosure sale.  Alternatively, De Moss and/or Creative and/or Slaughter and/or Turet aborted the December 4, 2012 foreclosure sale to cover an error in posting the sale, nevertheless charging plaintiffs for attorney fees and other costs for their erroneous foreclosure demands and posting.   Plaintiffs again tendered monthly payments to De Moss for

15

November and December 2012, as well as January 2013.  Slaughter returned these payments as well, while sending several more demand letters to plaintiffs in January, demanding with each letter substantially greater amounts to prevent a foreclosure sale, now scheduled for February 2013. According to one letter dated January 14, 2013, the amount demanded by Slaughter exceeded $4,000.00.

43.     None of the communications received from Slaughter or Turet contained the disclosures required by 15 U.S.C. §§1692e(11) and 1692g.

44.     Finally, after having charged twice for foreclosure fees against plaintiffs' account to post the foreclosure sale date two times, placing any possibility of cure outside plaintiffs' reach, Slaughter acted as "trustee" and sold the Property to Defendant Khosrow Abtahi (Abtahi) for $18,500.00. Abtahi has initiated an eviction proceeding, currently pending in Harris County Court at Law No. 4, Case No. 1029465, styled *Tony Abtahi v. Mahmoud Ashraf*.

45.     According to a letter from Slaughter dated February 6, 2013, only $13,638.20 of the sales price constituted "excess bid above the amount owed."  Thus, Slaughter and De Moss kept to themselves almost $5,000.00, thereafter refusing to return the "excess" proceeds to plaintiffs absent a release from liability for their bad acts.  On the date of the foreclosure sale,

the Property had a fair market value of at least $80,000.00.  The foreclosure sale resulted in a loss to plaintiffs of over $75,000.00.  Plaintiffs also lost the ability to provide a place to rest for their son after his medical treatments. Plaintiffs have suffered mental, emotional and physical loss.  Plaintiffs have had to hire attorneys to provide legal counsel and representation in their claims.

### F. FIRST CLAIM FOR RELIEF

46.     Plaintiffs repeat, reallege and incorporate by reference the facts stated in paragraphs 1 through 45 above.

47.     Slaughter and/or Turet collect consumer debts from consumers and they are each "debt collectors" as defined under the FDCPA, 15 U.S.C. §1692a(6).

48.     Slaughter and/or Turet used false or misleading representations by failing to disclose in the initial and/or subsequent communications with plaintiffs the disclosures required by 15 U.S.C. §1692e(11).

49.     Slaughter and/or Turet used false, deceptive and misleading representations, in violation of 15 U.S.C. §1692e, by making immediate demand to avoid foreclosure for amounts not yet due.

50.     Slaughter and/or Turet used false, deceptive and misleading representations, in violation of 15 U.S.C. §1692e, and used unfair or

17

unconscionable means to collect or attempt to collect a debt, in violation of 15 U.S.C. §1692f, by repeatedly presenting illusory invitations to plaintiffs to request payment plans for approval by De Moss, while ignoring plaintiffs' written request for a payment plan and failing to present plaintiffs' request to De Moss.

51.     Slaughter and/or Turet used false, deceptive and misleading representations, in violation of 15 U.S.C. §1692e, and used unfair or unconscionable means to collect or attempt to collect a debt, in violation of 15 U.S.C. §1692f, by making threats of a foreclosure sale in December 2012, when they did not intend to conduct the foreclosure sale.

52.     Alternatively, Slaughter and/or Turet used false, deceptive and misleading representations, in violation of 15 U.S.C. §1692e, and used unfair or unconscionable means to collect or attempt to collect a debt, in violation of 15 U.S.C. §1692f, by charging and demanding attorney fees for demands and posting of an erroneous and aborted December 2012 foreclosure sale.

53.     Slaughter and/or Turet used unfair or unconscionable means to collect or attempt to collect a debt by the collection of amounts (including interest, fees, charges, or expenses) which amounts were not expressly

authorized by the agreement creating the debt or permitted by law, all in violation of  15 U.S.C. §1692f(1).

54.     Slaughter and/or Turet failed to comply with 15 U.S.C. §1692g by failing to give the written notices described thereby with, or within 5 days after, the first communication with plaintiffs.

55.     Slaughter and/or Turet failed to comply with 15 U.S.C. §1692h by failing to apply plaintiffs payments to the undisputed portion of the debt.

56.     These and other violations of the FDCPA resulted in the loss of equity in plaintiffs' Property, loss of the ability to provide a place to rest for their son after his medical treatments, mental, emotional and physical suffering.

57.     Plaintiffs are entitled to statutory damages, actual damages attorney fees and costs.

## G. SECOND CLAIM FOR RELIEF

58.     Plaintiffs repeat, reallege and incorporate by reference the facts stated in paragraphs 1 through 45 above.

59.     According to Texas' Debt Collection Act, plaintiffs are "consumers," Slaughter and Turet sought to collect a "consumer debt" from plaintiffs, and Slaughter and/or Turet are "debt collectors." Tex. Fin. Code, Chapter 392, §§392.001(1), (2), and (6) (hereinafter cited by section).

60.    Moreover, Slaughter and/or Turet are "third-party debt collectors." Sec. 392.001(7).

61.    Slaughter and/or Turet failed to have on file in the office of the Texas Secretary of State a bond in the amount of $10,000.00, as required by Sec. 392.101.

62.    Slaughter and/or Turet used threats, coercion, or attempts to coerce by threatening to take an action prohibited by law in violation of Sec. 392.301(8).  For example and without limitation, they did so by demanding amounts not expressly authorized by the agreement creating the debt or permitted by law, and by use of false, deceptive and misleading representations, by repeatedly presenting illusory invitations to plaintiffs to request payment plans for approval by De Moss, while ignoring plaintiffs' written request for a payment plan and failing to present plaintiffs' request to De Moss.

63.    Slaughter and/or Turet used unfair or unconscionable means by collecting or attempting to collect interest or a charge, fee, or expense, incidental to the obligation that was not expressly authorized by the agreement creating the obligation or legally chargeable to the consumer, in violation of § 392.303(2).

64.    Slaughter and/or Turet used false, deceptive and misleading representations, and unfair or unconscionable means to collect or attempt to collect a debt, by making threats of a foreclosure sale in December 2012, when they did not intend to conduct the foreclosure sale in violation of §§392.303 and 392.304.

65.    Alternatively, Slaughter and/or Turet used false, deceptive and misleading representations, and used unfair or unconscionable means to collect or attempt to collect a debt, by charging and demanding attorney fees for demands and posting of an erroneous and aborted December 2012 foreclosure sale in violation of §§392.303 and 392.304.

66.    Slaughter and/or Turet used fraudulent, deceptive, or misleading representations by failing to disclose that the communication is an attempt to collect a debt and that any information obtained will be used for that purpose, in violation of § 392.304(5).

67.    Slaughter and/or Turet used fraudulent, deceptive, or misleading representations by misrepresenting the amount of the debt, in violation of § 392.304(8).

68.    These and other violations of the Texas Debt Collection Act resulted in the loss of plaintiffs' Property, loss of the ability to provide a

place to rest for their son after his medical treatments, mental, emotional and physical suffering.

69.    Plaintiffs are entitled to statutory damages, actual damages attorney fees and costs.

## H. THIRD CLAIM FOR RELIEF

70.    Plaintiffs repeat, reallege and incorporate by reference the facts stated in paragraphs 1 through 45 above.

71.    A violation of Chapter 392 constitutes a violation of Subchapter E, Chapter 17, Texas Business & Commerce Code, the Deceptive Trade Practices Act (hereinafter, "DTPA"), and the violation is actionable under that chapter. Sec. 392.404.

72.    Plaintiffs are consumers as defined under the DTPA because they sought or acquired condominium management services for which they were charged through, and they paid out of, their monthly assessments to De Moss.  Additionally, plaintiffs acquired the services provided by Slaughter and/or Turet, for which plaintiffs were charged and plaintiffs paid out of the foreclosure sales proceeds.

73.    To their detriment, plaintiffs relied upon the deceptive acts by Slaughter, Turet, De Moss and/or Creative.

74.     Among the deceptive acts, without limitation, Slaughter, Turet, De Moss and/or Creative knowingly and intentionally made immediate demand, on threat of foreclosure, for amounts not yet due; knowingly and intentionally presented repeated illusory invitations to plaintiffs to request payment plans for approval by De Moss - while ignoring plaintiffs' written request for a payment plan; and by knowingly and intentionally making immediate demand, on threat of foreclosure, for amounts (including, but not limited to, fees, charges, or expenses) not expressly authorized by the agreement creating the debt or permitted by law.

75.     Slaughter and/or Turet, in their communications with plaintiffs, describe their authority as attorneys to enforce a lien against plaintiffs' Property in part by reference to the "'Condominium Declaration for De Moss Condominiums' recorded in Volume 120, Page 83 in the Condominium Records of Harris County, Texas." Slaughter and/or Turet charged plaintiffs for their services as attorneys in making demand and posting plaintiffs' Property for foreclosure sale, twice - either by false threat or by their own errors and omissions, and committed deceptive acts thereby, and by ignoring those provisions of the Declaration limiting late charges to $5.00, knowingly and intentionally making demand on threat of foreclosure

for multiple late charges in the amount of $25.00, thereby contributing to placing any legitimate cure of default out of plaintiffs' reach.

76.    Slaughter and/or Turet, purported to act as "trustee" in the foreclosure sale of plaintiffs' Property.    Having received the excess foreclosure proceeds, which they acknowledge, Slaughter and/or Turet refuse to return the excess proceeds to plaintiffs without a "release" for their bad acts, contrary to their duty as trustee.

77.    These and other deceptive acts were a producing cause of the damages sustained by plaintiffs, which damages include actual damages, economic damages, and mental anguish damages.

78.    The deceptive acts were committed knowingly, with actual awareness, or as inferred by their conduct.    Plaintiffs are therefore entitled to additional damages of up to three times the amount of economic and mental anguish damages.

79.    The deceptive acts were committed intentionally, with actual awareness, as indicated by objective manifestations of their intent, or their conduct was carried out with flagrant disregard of prudent and fair business practices to the extent that they should be treated as having acted intentionally.    Plaintiffs are therefore entitled to an award of up to three times the amount of mental anguish damages.

80.     Plaintiffs are also entitled to recover their attorneys' fees.

## I. FOURTH CLAIM FOR RELIEF

81.     Plaintiffs repeat, reallege and incorporate by reference the facts stated in paragraphs 1 through 45 above.

82.     Plaintiffs are entitled to recover damages for wrongful foreclosure because there were multiple irregularities in the foreclosure sale that caused damages to plaintiffs consisting of the lost fair market value of the Property on the date of foreclosure less any liens properly owing against the Property and other actual damages.

83.     In addition, or alternatively, plaintiffs are entitled to rescission of the foreclosure sale to recover the Property from defendant Abtahi, because there was also a "grossly inadequate" sales price at the foreclosure sale.  The fair market value of the Property was at least $80,000.00 when it sold at foreclosure to Abtahi for $18,500.00.

## J. FIFTH CLAIM FOR RELIEF

84.     Plaintiffs repeat, reallege and incorporate by reference the facts stated in paragraphs 1 through 45 above.

85.     Defendants De Moss and/or Creative were bound to act in accord with the Declaration and By-Laws.  De Moss and/or Creative breached the Declaration by charging and demanding, on threat of

foreclosure, amounts not properly included in the assessment lien against the Property.

86.     In addition or in the alternative, Defendants De Moss and/or Creative were bound by their course of dealing with plaintiffs.  For years De Moss and/or Creative accepted monthly payments from plaintiffs despite existence of the Arrearage.  De Moss and/or Creative were required to give reasonable notice before they could refuse to accept plaintiffs' monthly payments without satisfaction of the Arrearage in full.  Alternatively, such course of dealing constitutes a waiver of the Arrearage.  Making demand for satisfaction in full, upon threat of foreclosure, without first giving notice that defendants would no longer honor their course of dealing, constitutes material breach of contract.

87.     In addition or in the alternative, defendants De Moss and/or Creative were bound by their invitation to plaintiffs to make a written request for payment plan.  While the invitation did not require that De Moss and/or Creative accept plaintiffs' written request for a payment plan, a contract may be formed where there is a manifestation of intention to act or refrain from acting in a specified way, so made as to justify a promisee in understanding that a commitment has been made. ***Montgomery Cty. Hosp. Dist. V. Brown***, 965 S.W.2d 501, 502 (Tex. 1998) (citing the

RESTATEMENT (SECOND) OF CONTRACTS §2(1) (1981)).  The terms of understanding communicated to plaintiffs required De Moss and/or Creative to review plaintiffs' written request for a Payment Plan and to make a decision whether to accept plaintiffs' request.  Failure by De Moss and/or Creative to review the request and their failure to consider whether to accept plaintiffs' request, constitutes bad faith and a breach of contract.

88.    To the extent plaintiffs failed to perform their obligations under the relevant agreements, their performance was excused by prior material breach by defendants De Moss and/or Creative.  Alternatively, plaintiffs' performance was excused because defendants De Moss and/or Creative prevented performance by plaintiffs.  Alternatively, plaintiffs' performance was waived by words, acts or conduct by defendants De Moss and/or Creative.

89.    As a result, plaintiffs suffered, among other things, actual damages in the amount overcharged or charged without authority and loss of equity in plaintiffs' Property.  Plaintiffs are entitled to recover their attorney fees.

## K. SIXTH CLAIM FOR RELIEF

90.    Plaintiffs repeat, reallege and incorporate by reference the facts stated in paragraphs 1 through 45 above.

91.     All     defendants,     other     than     Abtahi,     made     negligent misrepresentations in the course of their respective businesses, or in a transaction in which they had a pecuniary interest, without exercise of reasonable care or competence in obtaining or communicating the information.  Plaintiffs suffered pecuniary loss by justifiably relying on the representations.

## L. SEVENTH CLAIM FOR RELIEF

92.     Plaintiffs repeat, reallege and incorporate by reference the facts stated in paragraphs 1 through 45 above.

93.     Slaughter and/or Turet, acting as trustee, had a fiduciary duty to plaintiffs with respect to conduct of the foreclosure sale of plaintiffs' Property.  As attorneys providing and charging plaintiffs for foreclosure services, they knew or should have known that numerous irregularities existed in posting the foreclosure sale.  When Slaughter and/or Turet added to their role in the foreclosure process the position of trustee, they owed a fiduciary duty equally divided between plaintiffs and De Moss and/or Creative.  Because Slaughter and/or Turet knew and/or should have known that numerous irregularities existed, but proceeded with the foreclosure sale, they breached their fiduciary duty to plaintiffs.  Consequently, plaintiffs lost the equity in their Property and suffered mental anguish at the loss of their

home.  Plaintiffs are entitled to exemplary damages because the breach of fiduciary duty was intentional.

94.    In addition, or in the alternative, Slaughter and/or Turet, acting as trustee in the foreclosure sale, received and continue to hold in their possession the excess proceeds resulting from the foreclosure sale.  They refuse to turn over the excess proceeds to plaintiffs without a release for their bad acts as attorneys for De Moss and/or Creative.  This constitutes an intentional breach of their fiduciary duty to plaintiffs.  Consequently, plaintiffs lost the excess proceeds, and its use, detained by Slaughter and/or Turet.  Plaintiffs are entitled to exemplary damages because the breach of fiduciary duty was intentional.

95.    De Moss and/or Creative owed plaintiffs a fiduciary duty for their acts or omissions.  De Moss and/or Creative circumvented the Declaration by imposing the "Resolution Regarding Application of Funds" (the Resolution) and thereby applying plaintiffs' monthly assessment payments to Non-Lien Fees.  De Moss and/or Creative also charged plaintiffs inflated late charges and other Non-Lien amounts and charges, which amounts and charges were included in the assessment lien balance used to force the foreclosure sale of plaintiffs' property.  Without limitation, these acts and omissions constituted a breach of fiduciary duty by De Moss

and/or Creative.   Consequently, plaintiffs lost the equity in their Property and suffered mental anguish at the loss of their home.    Plaintiffs are entitled to exemplary damages because the breach of fiduciary duty was intentional.

## M. EIGHTH CLAIM FOR RELIEF

96.    Plaintiffs repeat, reallege and incorporate by reference the facts stated in paragraphs 1 through 45 above.

97.    Plaintiffs seek declaratory relief to determine their rights and true obligations under the agreements and statutes governing their ownership of the Property.

98.    By charging plaintiffs for amounts not expressly permitted under the controlling agreements and relevant statutory authority, plaintiffs' account and the amounts properly and actually owed by plaintiffs were misstated by defendants other than Abtahi.   Plaintiffs are entitled to a determination of the amounts properly and actually owed by plaintiffs.

99.    The Declaration limits the type of expenditures, charges and fees that can constitute a lien against a Unit Owner's property as consisting of Common Assessments and Special Assessments.   Plaintiffs assert that certain amounts charged by defendants, including without limitation inflated late charges and duplicate attorney fees, even if properly charged to plaintiffs, cannot constitute a lien against the Property enforceable by non-

judicial foreclosure, because such charges do not consist of Common Assessments and Special Assessments. Plaintiffs are entitled to a declaration that such amounts charged or chargeable against plaintiffs cannot constitute a lien against the Property and could not be included in the account balance used as grounds for non-judicial foreclosure. To the extent defendants employed accounting gimmicks to circumvent the Declaration by prioritizing the application of assessment payments to late charges and/or other non-lien charges, plaintiffs are entitled to a declaration that such application of payments improperly inflates the amount of the lien. Plaintiffs are also entitled to an accounting to establish the proper amount of any lien that may have been owed by plaintiffs at the date of the foreclosure sale.

100. Because the foreclosure sale by which defendant Abtahi purchased the property was wrongful, suffering from multiple irregularities in the foreclosure sale and because the foreclosure sales price was "grossly inadequate" in that the fair market value of the Property was at least $80,000.00 when it sold at foreclosure to defendant Abtahi for $18,500.00, Plaintiffs are also entitled to a declaration that the foreclosure sale of the Property to Abtahi is void.

## N. NINTH CLAIM FOR RELIEF

101.   Plaintiffs repeat, reallege and incorporate by reference the facts stated in paragraphs 1 through 45 above.

102.   Plaintiffs will likely suffer irreparable injury if defendant Abtahi is not enjoined, while this suit is pending, from proceeding with the eviction of plaintiffs from the Property and from proceeding to sell or encumber the Property.  Injury is imminent because trial in the eviction suit is currently set in the Harris County Court at Law No. 4 on July 1, 2013. Further, under Texas statute, the state court in an eviction suit cannot consider title issues such as the wrongful foreclosure claims asserted in this proceeding.  Consequently, there is a high likelihood that the County Court at Law No. 4 will render judgment against plaintiffs.

103.   The injury is irreparable and there is no adequate remedy at law because plaintiffs will lose possession and ownership of their real property, a home that is unique and, by its location, uniquely fills their needs to care for their son after medical treatments nearby.

104.   There is a substantial likelihood that plaintiffs will prevail on the merits because the foreclosure by which defendant Abtahi purchased the property was a wrongful foreclosure, suffering from multiple irregularities in the foreclosure sale and because the foreclosure sales price was "grossly

inadequate" in that the fair market value of the Property was at least $80,000.00 when it sold at foreclosure to defendant Abtahi for $18,500.00.

105.   The harm faced by plaintiffs outweighs the harm that would be sustained by defendant Abtahi if the preliminary injunction were granted. Besides their monetary loss, plaintiffs would also suffer loss of possession and ownership of their home making it more difficult to care for their son after medical treatments.   Defendant Abtahi would suffer delay in the use of his $80,000.00 foreclosure sale windfall that cost him only $18,500.00.

106.   Issuance of a restraining order and/or preliminary injunction would not adversely affect the public interest.  An investment purchaser at a foreclosure sale understands he is taking a risk in acquiring property subject to a wrongful foreclosure lawsuit, while the public has a valuable interest in protecting homeownership against wrongful foreclosure.

107.   Plaintiffs are willing to post a bond in the amount the Court deems appropriate.

108.   Plaintiffs ask the court to set their application for injunctive relief for hearing at the earliest possible time and, after hearing the request, to issue a preliminary injunction against defendant Abtahi from proceeding with the eviction of plaintiffs from the Property and from proceeding to sell or encumber the Property.

## O. TENTH CLAIM FOR RELIEF

109.   Plaintiffs repeat, reallege and incorporate by reference the facts stated in paragraphs 1 through 45 above.

110.   Plaintiffs ask the Court to set their application for injunctive relief for a full trial on the issues in this application and, after the trial, to issue a permanent injunction against defendant Abtahi.

## P. PRAYER

111.   For these reasons, plaintiffs asks for judgment against defendants for the following:

a.   Economic, actual and pecuniary damages for amounts improperly charged by defendants and for the loss of equity in plaintiffs' Property;

b.   Statutory damages for violations of the FDCPA in the amount of $1,000.00 for each plaintiff, plus actual damages and attorney fees;

c.   Statutory damages for violations of the Texas Debt Collection Act in the amount of $100.00 per violation for each plaintiff plus, actual damages and attorney fees;

d.   Actual, economic and mental anguish damages under the DTPA, and additional damages under the DTPA for up to three times the amount of actual, economic and mental anguish damages;

e.   Rescission of the foreclosure sale;

f.   Declaration regarding the amounts properly owed by plaintiffs at the time of the foreclosure sale, declaration regarding the amounts properly claimed to constitute a lien against the Property, and declaration that the foreclosure sale is void;

34

g.    Injunctive relief preventing defendant Abtahi from evicting plaintiffs from the Property and preventing defendant Abtahi from selling or encumbering the Property;

h.    Attorney fees;

i.    Costs of suit;

j.    Prejudgment interest;

k.    Postjudgment interest; and

l.    All other relief to which plaintiffs may be entitled.

Respectfully submitted,

THE LAW OFFICE OF LINDSAY LAMBERT

By: _____

Lindsay L. Lambert
Texas Bar No: 11844225
Federal ID No: 15079
5116 Bissonnet, Suite 400
Bellaire, Texas 77401
(888) 338-9052 – Telephone
(713) 239-8106 – Facsimile

ATTORNEY FOR PLAINTIFFS
ASHRAF MAHMOUD AND
VALERIE JACKSON

OF COUNSEL:

Henry A Jakob
State Bar No. 24000219
Law Offices of Henry A Jakob, PLLC
19901 Southwest Freeway
Sugar Land, TX  77479
832-458-1618 office
855-678-5585 fax
Mailing Address:
5826 New Territory Blvd., #513
Sugar Land, TX  77479